UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

IN ADMIRALTY

CASE NUMBER: 06-60309-CIV-BROWN
Magistrate Judge Brown

**THIS IS A CONSENT CASE**

NEW HAMPSHIRE INSURANCE
COMPANY,

    Plaintiff/Counter-Defendant,

v.

ROBERT KRILICH and RAINBOW AIR
CORP.,

    Defendants/Counter-Claimants   /

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

    This cause was tried to the Court non-jury on December 1, 2008 through December 5, 2008 upon stipulation of the parties.

    The Court has heard the testimony on the part of both parties, received and reviewed the file, examined the Court record, and has heard argument by counsel. The Court hereby makes the following findings of fact and conclusions of law:

**BACKGROUND**

    New Hampshire Insurance Company ("New Hampshire), the insurer under a policy of insurance ("Policy") insuring the Motor Yacht R.RENDEZVOUS (the "vessel") against all risks of accidental physical loss or damage, filed this action for declaratory relief pursuant to the Court's admiralty jurisdiction against the insured vessel's owner,

1

Rainbow Air Corp., and Robert R. Krilich, Rainbow Air's sole shareholder and an additional named insured on the Policy (collectively "Krilich" or "Defendants"). The case arises from the partial sinking of R.RENDEZVOUS while moored at her home berth, under benign weather conditions, on October 19, 2005. Defendants made a claim under the Policy for the resulting damage to the vessel, eventually asserting that the yacht was a constructive total loss. The dispute between the parties centers around whether the Policy requires New Hampshire to pay for the damage suffered by the vessel as a result of the sinking. In its Complaint for Declaratory Relief, New Hampshire requests this Court to declare that the loss is not covered by the Policy and that any damage to R.RENDEZVOUS was proximately caused by the unseaworthy condition of the vessel and/or causes which are expressly excluded from coverage under the language of the policy.

Defendants assert that any unseaworthy condition aboard the yacht was the fault of others for whom the Defendants were not responsible, stating that there was no causal connection between any dereliction of the Defendants and the submersion. See, *Defendants' Affirmative Defenses*, p. 5 - 6. Specifically, Defendants maintain the loss is covered because it was caused, *inter alia*, by the ingress of water into the yacht's keel through an area of delaminated fiberglass that resulted from an inadequate repair of prior damage at a marina, which negligence is not attributable to the insureds. The insureds contend they are also entitled to recover the costs incurred in the raising (salvage) of the vessel and its removal to the Bradford Marine boat yard, which was adjusted to $80,000.00, as well as attorney's fees, if they prevail in this action. Krilich also filed a counter-claim for breach of contract, alleging that the vessel was at all times

well-maintained and that she sank "due to an unexpected and not reasonably apparent rupture in the keel." See, Defendants' Counter-Claim p. 6 - 8.

## FINDINGS OF FACT

The Court, having heard the testimony of the witnesses, the evidence admitted and the facts stipulated to by the Parties, find the facts are as follows:

1. **The Vessel**

R.RENDEZVOUS is a 110 foot, composite fiberglass hull motor yacht, built by Christiansen Shipyard in Vancouver, Washington and completed in 1992. [Plaintiff's Ex. 6; Pre-trial stipulation, DE-116]. The following vessel characteristics are relevant to the issues that were contested at trial:

a. R.RENDEZVOUS is constructed such that the interior of her hollow composite fiberglass keel, the lowest point of the vessel except for her propellers, forms a 700 gallon "black water" tank designed to hold sewage. The fiberglass keel forms the outer wall of the black water tank, which runs approximately two-thirds of the length of the keel, starting from underneath the engine space in the stern and continuing forward under the accommodation areas. [Plaintiff's Ex. 6; Pre-trial stipulation, DE-116].

b. The black water tank has only one designed point of access, an aluminum tank cover about one foot by three feet, located directly under the removable deck plates in the vessel's engine room. When not open for cleaning, inspection and/or repair, the tank is designed to be made "watertight" by means of a gasket and tank cover held in place by 18 threaded bolts evenly spaced around the perimeter of the

cover. [Plaintiff's Ex. Nos. 6 and 8-5121; Trial Tr. p. 73 - 74;12/2/08; Trial Tr. p. 80; 12/3/08].

c. R.RENDEZVOUS is equipped with four 120 VAC Rule Model 2800 bilge pumps located in the after part of the vessel: two in the engine space bilges, with two more in the lazarette, or storage space, directly aft of the engine room. Each pump is rated to discharge 2,800 gallons of accumulated water per hour, or approximately 47 gallons per minute, from the bilge spaces overboard. Each pump is equipped with an automatic float switch, designed to activate the pump when the accumulated water in the bilge reaches a pre-determined level. Thus, there is a "low water" float switch in the bilge, designed to automatically activate one pump when the water in the bilge reaches a pre-set, minimal level. A second or "high water" float switch is designed to trigger the second pump if and when the accumulated water reaches a higher level, toward the top of the bilge. [Plaintiffs Ex. Nos. 6; 49].

d. Additionally, the alarm system aboard R.RENDEZVOUS includes two bilge alarms. The first high water bilge pump alarm is intended to sound when the water in the bilge rises to a height sufficient to activate the high water bilge pump. The second, separate, high water alarm is designed to sound if and when the water in the bilge rises to a pre-determined height above that required to trigger the high water bilge pump. There are also two other, separate alarms within the black water tank itself. The first alarm is designed to annunciate when the water in the tank reaches about two-thirds capacity, and the second alarm to sound when the tank is nearly full. In addition to an audible horn, all of the bilge and black water tank alarms have visual red light indicators located on a dedicated panel board in the pilothouse that illuminate when an alarm

condition exists. [Plaintiffs Ex. No. 49; Plaintiffs Ex. No. 9-5181; Trial Tr. p. 73; 12/1/08; Trial Tr., p. 88; 93 - 94; 12/2/08; Healy Depo. p. 93].

e. R.RENDEZVOUS contains two "sea chests," one port and one starboard, located in the engine room, used to draw seawater into the vessel through the bottom of the hull to provide seawater to cool selected machinery. The sea chests are essentially twelve inch square boxes that extend into the machinery space about two feet above the deck plates at their top end and then downward through the hull, ending in a seven inch square grated opening. The grate permits seawater to freely enter and flood the sea chests up to the level of the vessel's static water line, or the line of contact between the water's surface and the boat's exterior hull. The water level within the sea chests will rise and layer as the yacht's static water line rises and falls. The sea chests are constructed with thick, clear, watertight plexiglass covers, which are the only means provided to prevent sea water ingress into the engine room in the event that the yacht's static waterline rises above the height of the sea chest tops. [Plaintiff's Ex. Nos. 6; 48; Trial Tr. p. 14; 19 – 20; 12/3/08; Demonstrative Ex. Nos. E-2; E-6; Connell Depo. p. 21].

2.   **The Vessel Owner/Caretaker**

From the completion of her construction and throughout her coverage with New Hampshire the vessel has been owned by Defendant Rainbow Air Corporation, Defendant Robert Krilich has been the sole shareholder of Rainbow Air Corporation. [Pre-trial stipulation, DE-116].

Arnold "Arnie" Lockwood was the sole employee of Rainbow Air. [Trial Tr. p. 171-172; 12/2/08]. By July 1998 Lockwood considered himself responsible for the yacht's day-to-day maintenance, with responsibility to review and sign maintenance and repair

contracts. [Trial Tr. p. 64; p. 67; 12/1/08]. His duties consisted of general maintenance and upkeep of the yacht and its machinery, including the air conditioning, sea chests and the like. [Trial Tr., p. 58; 12/1/08; Trial Tr., p 147 -148, 163 - 165; 12/3/08].

Robert Krilich testified that he "absolutely" invested Arnie Lockwood with the authority to act on his behalf with respect to the care of R.RENDEZVOUS. [Trial Tr. p. 141; p. 168; 12/4/08]. Kim Plencner, the executive vice president of Rainbow Air, also testified that Arnold Lockwood was responsible for the day to day maintenance of the vessel, including the hiring of outside contractors, from 1995 through the time of her sinking in October of 2005. [Trial Tr. p. 173 -174; 12/2/08]. Krilich and Plencner were kept fully aware of all developments concerning the yacht's maintenance and repair, including Lockwood's activities. [Trial Tr. p. 125, 12/1/08; Trial Tr. p. 201; 12/2/08; Trial Tr. p. 141 - 142, 12/4/08].

3.   **The Vessel's Berth**

a.   The vessel was at all material times docked behind Defendant Robert Krilich's home at 851 East Flamingo Drive in Fort Lauderdale, Florida. Krilich specifically constructed the berth and floating dock to hold the 110 foot R.RENDEZVOUS. [Trial Tr. p. 135 – 136; 12/4/08; Pre-trial stipulation, DE-116]. Because the water depth increases as the berth slopes away from the seawall, a floating dock is used to keep the yacht off the dock and in the deeper water of the Intercoastal Waterway. [Trial Tr., p. 61; 136; 162-163; 12/4/08]. Approximately two years after the berth was constructed, Krilich, at the suggestion of the vessel's then-captain, arranged to have a hole "scalloped" in the coquina limestone substrate on the eastern end of the berth, to accommodate the greater depth of the vessel's "running

gear"; *i.e.* her propellers and shafts, which sit lowest in the water. As a result of this configuration the yacht must always tie to the dock in the same position, with her bow pointing west and moored to the berth on her starboard side, to afford access to the space constructed for the running gear. [Trial Tr. p. 63; 136 – 137; 12/4/08].

    b.    At the time of the application for the subject insurance in March of 2003, the insured advised New Hampshire that the vessel was not intended to be used beyond 50 engine hours per year, and essentially was going to be berthed permanently behind the insured's residence for the policy period. [Pre-trial stipulation, DE-116; Plaintiff's Ex. 2]. With the exception of traveling to nearby marinas to seek refuge from several named hurricanes, the vessel did not leave her dock during the policy period. [Pre-trial stipulation, DE-116; Trial Tr., p. 87; 12/1/08].

    c.    Arnie Lockwood testified that although the boat's berth is located in a no-wake zone, he generally found that speeding boaters affected the wake, which, in turn, affected the vessel. [Trial Tr., p. 138; 12/1/08].

    4.    **The Policy**

    a.    New Hampshire's Policy for marine insurance number EY 341-91-35 was first issued to Rainbow Air Corporation as the registered Owner of R.RENDEZVOUS, naming Robert Krilich as an additional insured, on March 20, 2003, with effective coverage through March 19, 2004. The parties renewed the Policy on March 20, 2004, and for a third and final time on March 20, 2005 with effective coverage through March 19, 2006. The Policy declares an agreed hull value of $2,400,00.00 with a deductible of $48,000.00. [Pre-trial stipulation, DE-116, Plaintiff's Ex. Nos. 3, 4 and 5].

b.  New Hampshire's Policy for R.RENDEZVOUS provides coverage for "direct physical losses arising out of all risks unless otherwise excluded", expressly including losses from "hidden defects."

The Policy does not cover:

> ... any loss or damage arising out of: (a)...(b) <u>Any wear and tear, gradual deterioration</u>, weathering, inherent vice, insects, vermin, mold, marine life, electrolytic or galvanic action, corrosion, dampness of atmosphere, gel coat or fiberglass blistering, ice, freezing, <u>wet or dry rot</u> or extremes of temperature;

The Policy excludes the following from coverage:

> Exclusions: We shall not cover any loss or damage arising out of: (a) any intentional misuse or misconduct, or <u>lack of reasonable care or due diligence</u>, in the operation or <u>maintenance</u> of your[1] yacht or trailer;

[Plaintiff's Ex. No. 2] (Emphasis added).

5.  **R.RENDEZVOUS' repair history**

a.  In May of 1994, approximately two years after delivery to Defendant Krilich, R.RENDEZVOUS underwent repairs to her port and starboard propellers, port and starboard propeller shafts, replacement of her cutlass bearings and repair of damage to the fiberglass keel at Bradford Marine. [Plaintiff's Ex. No. 23; Pre-trial stipulation, DE-116].

b.  In September of 1996 R.RENDEZVOUS again underwent repairs to her port and starboard propellers, port and starboard propeller shafts, replacement of her cutlass bearings and repair of damage to the aft end of the fiberglass keel "where worn

---

[1] The definition of "you" and "your" includes "[a] captain or crew who work on **your yacht**.." Policy DEFINITIONS ¶ 19 (emphasis in original).