thru (*sic*) inside and out" at Bradford Marine. [Plaintiff's Ex. No. 24; Pre-trial stipulation, DE-116].

    c.    In February of 1997, R.RENDEZVOUS for the third time underwent repairs to her port and starboard propellers, starboard propeller shaft and her fiberglass keel at Bradford Marine. [Plaintiff's Ex. Nos. 25; Pre-trial stipulation, DE-116].

    d.    In July of 1998 R.RENDEZVOUS again underwent repairs to her starboard propeller and fiberglass repairs "on exterior keel and hull". [Plaintiff's Ex. Nos. 15; 27].

    e.    From May 22 to June 6, 2000, R.RENDEZVOUS underwent repairs at Bradford Marine when the vessel was hauled out of the water for damage to both propellers and "Repair fiberglass keel in way of black water tank". [Plaintiff's Ex. No. 17; 29; Pre-trial stipulation, DE-116].

    f.    In March 2001, repairs to both the starboard and port propellers and cutlass bearings of R.RENDEZVOUS were carried out by Marina Mile Shipyard. [Ex. No. 18; 19; 20; 30; 31; Pre-trial stipulation, DE-116].

    g.    In January and February 2003, R.RENDEZVOUS underwent repair at Roscioli Yachting Center to her starboard propeller; work to fill in certain areas of the bottom identified by the U.S. Coast Guard; and replacement of the hoses and clamps and gaskets for the black water tank. [Ex Nos. 22; 38; Pre-trial stipulation, DE-116]. Afterwards, R. RENDEZVOUS passed its 2003 U.S. Coast Guard inspection. [Trial Tr., p. 22; 12/3/08].

6. **The Loss**

On the morning of October 19, 2005, R.RENDEZVOUS partially sank at her berth, in clear weather and calm seas. [Pre-trial stipulation, DE-116]. Lockwood contracted with Sea Tow, Inc. to raise the yacht from the bottom of her berth, and tow her to the Bradford Marine boat yard in Fort Lauderdale. [Trial Tr., p. 145 - 146; 12/1/08; Trial Tr., p. 38 - 39; 12/2/08].

The sequence of events leading to the vessel's submersion was as follows:

a. Over a period of time an area of the vessel's fiberglass keel developed a fracture that allowed seawater to pass though the hull material of the exterior keel into the "black water" tank, filling the 700 gallon tank. [Counter-claim DE - 10; Trial Tr., p. 40; 12/3/08; Connell Depo., p. 7; Trial Tr., p. 40 - 42; 12/2/08; Plaintiff's Ex. Nos. 8-5095 - 5105]. The evidence was inconclusive as to the cause of this fracture.[2]

b. On October 19, 2005, the watertight cover for the black water tank was not secured and the incoming seawater eventually overflowed the tank and proceeded to fill the bilges and surrounding engine room space. [Trial Tr., p.70, 95 - 96; 12/2/08; Trial Tr., p. 15 - 16; 12/3/08; Plaintiff's Ex. No. 48; Connell Depo., pp. 7, 9 - 10]. There were

---

[2]Defendants' expert, naval architect Peter Gimpel, testified that in his opinion there was a prior faulty repair which allowed a gradual delamination of a portion of the fiberglass keel, but that there were many alternative ways in which the delamination that led to the crack in the yacht's keel might have progressed, and he could not identify any particular one as being the most likely. [Trial Tr., p. 16, 35, 37-55; 12/5/08]. Plaintiff's expert, forensic engineer Commander Bryan Emond testified that in his opinion there was no evidence to support the proposition that a faulty repair caused the delamination, but that it would have occurred over a "considerable period of time." [Trial Tr., p. 39-41; 12/3/08]. There was some evidence that at certain times prior to 2000, the keel of the vessel may have been scraping the bottom of her berth. [Bundgaard Depo., p. 24 - p. 26; Trial Tr., p.80 - 81; 12/04/08; Healy Depo., p. 16 -17; 21- 22; 25; 27 - 29; 35; 38 - 39]. There was also evidence, however, including that at the time of the sinking, the yacht conservatively had at least a foot of clearance at the lowest possible tidal stage, which was reasonable and adequate. [Trial Tr., p. 4, 28 - 31, 61 - 63; 12/5/08; Exhibit U].

holes visible on the black water tank for fasteners such as nuts and bolts, but there were no fasteners visible. [Trial Tr. p. 70; 12/2/08].

   c.   The sea water overflowing the black water tank into the bilges traveled toward the after part of the vessel, and its weight lowered the stern deeper into the water. [Trial Tr., p. 95 - 96; 12/2/08; Trial Tr., p. 17; 12/3/08; Plaintiff's Ex. No. 48].

   d.   Eventually, the weight of the flooding sea water caused the vessel's static water line to rise above the height of the top of the sea chests.  The sea chest covers were not fastened securely, which allowed a large quantity of water to flood the engine room.  The primary source of the water inflow was the starboard sea chest. [Gottfried Depo., p. 39 - 41, 45 - 46].  It was only after the sea chests were secured that the eight "de-watering" pumps placed onboard by Sea Tow begin to make significant progress in removing the water from the yacht.  [Gottfried Depo., p. 55 - 56 L 14; Trial Tr., p. 21, 25; 12/2/08; Plaintiff's Ex. Nos. 7-5036 - 5047].

   Some of the bolts securing the cover to the starboard sea chest in place were missing and of the bolts that were in place, not all of them had securing nuts on them. Some nuts and bolts were found scattered on the deck nearby.  The cover was loose enough that inflowing water could dislodge it.  The cover to the port sea chest was also found to have loose bolts that allowed water to flow into the vessel. Jt. Pretrial Stip. §5, ¶16.  There was no competent evidence as to how long the sea chests had been left open.

   The resulting hydrostatic pressure caused the water to gush through the unsecured top of the sea chests, swiftly flooding the engine room and quickly

11

submerging the yacht. [Trial Tr., p. 95 - 96; 12/2/08;Trial Tr., p. 26 - 27; 12/3/08; Plaintiff's Ex. No. 48; Connell Depo., p. 19].

    e.    At the time of her submersion, the yacht's engine room bilge pumps were either turned off or inoperable, in that Commander Emond testified that if functional, the bilge pumps would have been able to handle the rate of water flow aboard the vessel prior to the submersion of the sea chests below the vessel's static water line. [Trial Tr., p. 26; 12/3/08]. Surveyor Stewart Hutcheson also concluded that the pumps were not operational at the time of the sinking because they did not keep up with the water which was coming in. [Trial Tr., p. 119 -120; 12/2/08].[3] Lockwood could not state whether the engine room bilge pumps were operable on the day of submersion. [Trial Tr., p. 99; 12/1/08]. In fact, the Defendants have offered no evidence that the pumps were operating on October 19, 2005.

    f.    At the time of her submersion, the yacht's engine room bilge alarms and black water tank alarms were either turned off or inoperable. During his inspection of the engine room bilges and the black water tank immediately after the yacht was hauled, surveyor Hutcheson manually tripped the float switches in the bilges and the black water tank, but he heard no alarms. [Trial Tr., p. 89; p. 93 - 94; 12/2/08].

Lockwood was unable to confirm whether the high water bilge alarm was working, as he did not hear anything that day. [Trial Tr., p. 100; 12/1/08]. However, the yacht's Captain, Paul Healy described the high water bilge alarm as an aggravatingly loud siren and if sounding, would have been heard by someone in the house, working on deck or working in the forward stateroom. [Healy Depo., p. 93]. The vessel's former

---

[3]The Court rejects Defendants' argument that all of the evidence that the bilge pumps were not operating was based on inadmissible hearsay in the form of the Wards Electrical report.

12

captain, Captain Anders Bundgaard, confirmed that the high water alarm was loud and could be heard on the dock and in the house. [Bundgaard Depo., p. 103].

Plaintiff's expert, Captain David Smith, opined that the bilge alarms were inoperable on the day of the sinking, based on the sworn statements of the day workers on the boat at the time, which were corroborated by a report from Wards Electric [Trial Tr., p. 74 - 78; p. 99; 12/3/08].

**7. Evidence Regarding the Proximate Cause of the Loss**

a. Lockwood testified that at approximately 6:00 a.m. on the morning in question, he did a visual inspection of the vessel of the bridge, the lazarette and the engine room, and checked the bilges in the engine room.[4] [Trial Tr. p. 126-128; 12/1/08]. He did not specifically inspect the covers on the sea chests. [Trial Tr. p. 132-33; 12/1/08]. He left the boat and returned at approximately 9:00 a.m. with some day workers, whose jobs did not require them to go into the engine room. [Trial Tr. p. 133-354; 12/1/08]. He then left again but shortly thereafter got a call from one of the workers that water was coming over the swim platform, and he returned to the boat and found it partially submerged. [Trial Tr. p. 135, 138-140; 12/1/08].

Lockwood testified that his daily inspection of the bilges consisted merely of looking underneath the engines, despite knowing that this limited observation would not alert him as to whether there was water in other, lower bilge spaces. [Trial Tr. p. 75 - 76; 12/1/08]. Lockwood had never personally lifted up the deck plates and examined the

---

[4] The Court finds Lockwood's testimony regarding checking the bilges to not be credible, as further discussed, infra.

black water tank and its cover, even after a sewage overflow in April 2004. [Trial Tr. p. 99, 100 - 101, 120; 12/1/08]. [5]

He had no "routine" to check the bilge pumps but would turn them on "sometimes" after a heavy rainstorm. [Trial Tr. p. 96 - 97; 12/1/08]. Lockwood admitted that he did not know whether the float switches in the engine room bilges were for the pumps, the alarms, or both, and he had never tested the float switch for the engine room high water alarm. [Trial Tr. p. 93, 97-98; 12/1/08]. He admitted he did nothing to check and make sure the bilge pumps in the engine room were functioning correctly after 2002 when the automatic float switches were replaced. [Trial Tr. p. 98-99; 12/1/08].

Lockwood testified that he normally left the engine room bilge pump switch on the automatic position; yet he testified that he had to manually operate the bilge pumps to empty the bilges in April of 2004, but did not consider that perhaps this indicated a problem with the automatic float switches for the engine room bilge pumps. [Trial Tr. p. 96; p. 121 - 122; 12/1/08]. Lockwood also testified that even though it was obvious that the water had come from the black water tank, he did not check to see whether the black water cover was secure. [Trial Tr. p. 96; p. 117-120; 12/1/08].

Maintenance notes kept by Lockwood indicate that on July 22, 2005 an audible alarm sounded and he discovered high bilges, and two alarms indicated "problems with the stern area. Lockwood testified that he then "activated all engine room and lazarette bilge pumps" and there was a "slow evacuation" of the water, which was approximately

---

[5]Captain Paul Healy testified that approximately three months prior to the sinking, he lifted up the deck plates near the black water tank cover and noted that the cover was properly in place, but he could not state whether or not the cover was fastened down. [Healy Depo. p. 94-95].

14

four feet deep. The cause of the water was determined to be a disconnected hose. [Trial Tr. p. 22-23; 12/4/08].

Lockwood further testified that he had no regular program for inspection of the sea chests, [Trial Tr. p. 103; 12/1/08], but would periodically clean the strainers in the sea chests, and when finished, he would replace the covers and secure them with the bolts and washers. [Trial Tr., p. 165-66; 12/3/08; Trial Tr. p. 10 - 11; 12/4/08.] Lockwood's testimony was inconsistent on this point, however, in that in his prior deposition, he testified that he was not certain whether he had fastened all of the nuts and bolts when he last cleaned the sea chests two weeks prior to the sinking. [Lockwood Depo. p. 126.] Lockwood agreed that it would only require a casual glance to ascertain the condition of the sea chest covers; whether or not the covers were secured properly was open and obvious. [Trial Tr. p. 105 - 106; 12/1/08]. He testified that an air conditioning company had been working on the yacht two days prior to the sinking. [Trial Tr. p. 21; 12/4/08]. However, he had no personal knowledge or information how the sea chests might have been left partially unsecured on the day in question. [Trial Tr. p. 161; 12/1/08].

    b.   Kim Plencner acknowledged that he received a letter from Captain Paul Healy in 1998 stating that the R.RENDEZVOUS "is in a state of total neglect and disrepair due to having no full time crew...." [Trial Tr., p. 180; 12/2/08; Ex. 28]. Plencner testified that he personally inspected the vessel from 1998 to 2002 and was satisfied with the condition of the vessel, yet in April of 2002 a survey report prepared by Marine Surveyors International had several pages of findings and recommendations, including: the hose lines exhibiting dry rot; salt water intake circulation pumps being

15

corroded; inattention to routine maintenance of generators, including degradation and dry rot on fittings and hoses; a non-maintained condition of the machinery spaces, lazarette and bilge areas; and the bilges in the engine room and lazarette being filled with oil. [Trial Tr., p. 187-92; 12/2/08; Ex. 54]. Plencner admitted that the survey's conclusion that the "[c]onsequence of an apparent laxity for routine maintaining and scheduled upkeep" was that the vessel was "considered to be in less than fair condition for its age" caused him concern about the job that was being done by the persons who were responsible for maintaining the vessel. [Trial Tr., p. 193; 12/2/08]. Although Plencner testified that he was "sure [they] did something," he could not recall specifically what steps he took after this survey report to make sure the lax maintenance situation did not happen again. [Trial Tr., p. 197; 12/2/08]. Additionally, Plencner testified that he "[didn't] know actually what the proper maintenance is" with respect to detecting and correcting corrosion in a salt water environment. [Trial Tr., p. 190; 12/2/08]. Plencner testified that he was satisfied with the job that Lockwood did from 1998 to 2002 in regard to taking affirmative action to maintain the vessel in good condition, and he did not believe that Lockwood did anything different from 2002 to 2005 than he did from 1998 through 2002 to maintain the vessel in good condition. [Trial Tr., p. 134; 12/3/08].

    c.    Upon examination at Bradford Marina immediately after the vessel was hauled from the water, surveyor Hutcheson observed the uncovered black water tank and took measurements of the yacht's static water line. He concluded that "the flooding would have become catastrophic when the static water line reached the top of the sea chests which were open." [Trial Tr., p. 72 -73; 12/2/08]. He also stated that the vessel's

unsecured black water tank top was clearly visible upon lifting the aluminum deck plates in the engine room. [Trial Tr., p. 70; 12/2/08].

Mr. Hutcheson estimated that it would have taken approximately 18 hours for the sea water to have filled the black water tank. [Trial Tr., p. 120-21; 12/2/08]. Surveyor Hutcheson further testified that leaving the black water tank and/or the sea chests uncovered, even when in port, does not comport with good marine practice. [Trial Tr. p. 82 - 84; 12/2/08].

d. Plaintiff's expert, Captain Smith, also made it clear in his testimony that due diligence required that the yacht's sea chest covers remain securely fastened except for inspection or cleaning, as to leave them off subjects the yacht to the threat of water ingress. He stated that the fact that the yacht is moored at her berth does not alter the requirement that the sea chest covers should be securely fastened, watertight, in that a vessel simply is not seaworthy if the covers to the sea chests are not securely fastened [Trial Tr. p. 82-83; 12/3/08].

Captain Smith testified that due diligence in the maintenance of a yacht such as R.RENDEZVOUS involved a daily inspection of the bilges, especially the low areas. Merely walking through the vessel is insufficient; adequate inspection requires that one "open doors, cabinets, deck covers, deck plates, whatever, to view a low area in the bilge where water would collect" to look for the presence of water or other fluids. Smith also testified that the high water alarm system should be tested quarterly, if not monthly. [Trial Tr. p. 78 - 79;12/3/08].

In Smith's opinion due diligence required the Master to visually inspect the black water tank once a month. Smith testified that every time the black water tank cover was