removed a prudent Master would inspect to see that it was replaced watertight after maintenance or repair by an independent contractor. [Trial Tr. p. 80 - 81; 12/3/08]. Captain Bundgaard agreed with Smith that good marine practice requires the captain to monitor workmen's activities to ensure that repairs are carried out effectively. [Trial Tr. p. 86 - 87; 12/4/08]. Mr. Connell, in his deposition, confirmed that he, personally, would inspect work performed on the black water tank by an independent contractor to ensure that everything was properly secured. [Connell Depo. p. 14].

  e. Commander Emond likewise testified that the water would not have overflowed the black water tank had the cover been securely fastened. [Trial Tr. p. 20; 12/3/08]. He further agreed that the seawater that flooded the engine room and sunk the yacht overflowed from the sea chests and could not have done so if the covers had been properly secured water tight. [Trial Tr., p. 19 - 20; p. 26 - 27; 12/3/08; Plaintiff's Ex. 48; Demonstrative Aids E 6 - E11].

  Commander Emond noted that the fact that the after engine room bilges on R.RENDEZVOUS do not have either a pump or an alarm makes it even more imperative to conduct periodic visual inspection. He stated it is a simple matter to lift up the aluminum deck plates by way of the black water tank and visually observe the condition of the bilges - the deck plates are not bolted or otherwise secured. [Trial Tr. p. 63 - 64; 12/3/08].

  f. Defendants' expert marine surveyor Robert Connell agreed that sound marine practice, whether or not the vessel is moored, is to replace and fully secure the sea chest covers after opening them. [Trial Tr. 120; 12/4/08; Connell Depo. p. 44]. This opinion was confirmed by Captain Bundgaard. [Bundgaard Depo., p. 73; 101]. Mr.

Connell also testified that had the sea chests been securely fastened, the speed with which the vessel sank would have been reduced. [Connell Depo., p. 30]. Defendants' expert naval architect Peter Gimpel also admitted that but for the fact that the sea chest covers were not securely fastened, R.RENDEZVOUS would not have sunk as quickly or in the manner in which she did. [Gimpel Depo. p. 85].

     g.    Mr. Connell also confirmed that it is good marine practice to inspect the watertight tank cover on the black water tank every three to six months, and that the better practice is to secure the watertight black water tank cover unless it is necessary to gain access for maintenance or repair. [Trial Tr. p. 115 - 116; 12/4/08].[6] Captain Bundgaard also confirmed this opinion. [Bundgaard Depo. p.100].

Mr. Connell testified that he, personally, would inspect the bilges of a vessel with a history of water intrusion more frequently than every three or four months. Furthermore, under such circumstances it is important that the vessel have a properly functioning high water alarm system, because the alarm is relied upon as the means to alert the captain of the presence of water in the bilges. [Trial Tr. p. 113 - 115; 12/4/08]. Mr. Connell testified that a thorough inspection of the engine room bilges onboard R.RENDEZVOUS required lifting the aluminum deck plates and visually examining the area, and that an individual charged with the responsibility of a vessel the size of R.RENDEZVOUS should be familiar with the engine room bilge configuration. [Trial Tr. p. 111 - 112; 12/4/08].

---

[6] At trial, Mr. Connell defined the phrase "good marine practice" as "It generally means to keep the equipment working." [Trial Tr., p. 106; 12/4/08].

h.  The only "evidence" offered by Defendants to counter Plaintiff's proof of the failure to comport with good marine practice with respect to the sea chests was surveyor Hutcheson's testimony that if a vessel is in port and the sea chest is uncovered, that alone should not cause a vessel to sink [Trial Tr., p. 111; 12/2/08] and that Coast Guard regulations require hatches and openings in the hull to be tightly closed except when operating on lakes, bays, sounds or rivers in calm weather. 46 CFR, Section 185.330. Additionally, Mr. Connell testified that although it is "good marine practice" to secure the sea chests, they are left open "throughout the industry" on yachts that are tied up in inland waters because it facilitates cleaning and therefore, cooling. [Trial Tr., p. 120; 12/4/08].

## CONCLUSIONS OF LAW

### JURISDICTION

1.  The Court has admiralty jurisdiction over this case pursuant to 28 U.S.C. § 1333. This Court also has jurisdiction under Rule 9(h) of the Federal Rules of Civil Procedure and Supplemental Rules governing admiralty and maritime claims, as a contract for marine insurance is a maritime contract. New England Mutual Marine Ins. Co. v. Dunham, 78 U.S. 1 (1870); Wilburn Boat Co. v. Fireman's Fund Insurance Co., 348 U.S. 310 (1955).

## PROXIMATE CAUSE OF THE SINKING[7]

2.   The Supreme Court instructs that the existence or non-existence of a causal connection between the loss and the peril insured against in a policy of marine insurance is determined by looking into the factual situation in each case and applying the concept of "proximate cause." Standard Oil Co. v. United States, 340 U.S. 54, 58 (U.S. 1950). "[T]he true meaning of that maxim is, that it refers to the cause which is most nearly and essentially connected with the loss as its efficient cause." Id. The cause which is truly proximate is that which is proximate in efficiency. Lanasa Fruit S.S. & Importing Co. v. Universal Ins. Co., 302 U.S. 556, 563 (U.S. 1938); see also, Tillery v. Hull & Co., Inc., 876 F. 2d 1517, 1519 (11th Cir. 1989); ("Courts analyzing problems of marine insurance causation have, as a rule, applied strictly the doctrine of *causa proxima non remota spectatur* ('the immediate not the remote cause is considered')".

Although the concept of proximate cause does not necessarily refer to the cause nearest in point of time to the loss, the last cause is not excluded simply because of its position in the chain of events. As stated cogently by the Second Circuit in Blaine Richards & Co. v. Marine Indem. Ins. Co., 635 F.2d 1051, 1054 -1055 (2d Cir.1980):

---

[7] As an initial matter, Plaintiff argues that the loss was not fortuitous and that therefore it should not be covered under the Policy. See Int'l. Ship Repair & Marine Services v. St. Paul Fire & Marine Ins. Co., 944 F. Supp. 886, 892-93 (M.D. Fla. 1996) (noting that an all risks policy covers all fortuitous loss except for those occasioned through a breach of warranty or otherwise specifically excluded under the policy, and that a loss is not considered fortuitous "if it results from an inherent defect in the object damaged, from ordinary wear and tear, or from the intentional misconduct of the insured.") The Court need not reach this issue, in that the Court finds that even if the loss was fortuitous, coverage is excluded under the Policy, as further discussed infra. Furthermore, because the Court finds that coverage under the Policy is excluded, the Court need not reach the merits of Plaintiff's argument that the vessel was unseaworthy at the time the risk attached.

21

"Determination of proximate cause in these cases is thus a matter of applying common sense and reasonable judgment as to the source of the losses alleged."

3. The Court rejects Defendants' position that the cause of the loss was the fracture in the keel. The Defendants' experts testified at trial that even with water entering the yacht through the deteriorated keel, the vessel would have remained afloat indefinitely if the black water tank top had been securely fixed in place. Notwithstanding the open black water tank, the yacht had two 2800 gallon per hour pumps in the engine room bilges, which had more than adequate capacity to keep the bilges from fully flooding, had they been working. It was only after the weight of the water in the stern pushed the unsecured tops of the sea chests below the vessel's water line that the yacht's fate was sealed.[8]

4. Nor does the Court find that the proximate cause of the loss was the failure to cover the black water tank. Although there was clear evidence that if the cover to the tank had been properly secured, the water would have remained in the tank, had the sea chests been closed and the bilge pumps and alarms operational, the loss could have been avoided. If the three-quarter tank alarm were operable, Lockwood should have heard it during his 6 am walkthrough on October 19, if not earlier. Moreover, Lockwood was only away from R.RENDEZVOUS for about 25 to 30 minutes before she sank. [Trial Tr., p. 139; 12/1/08]. As it is a virtual certainty that it took longer than 25 to 30 minutes for the incoming water to fill the engine spaces and force the sea chests below the static water line, Lockwood should have heard the tank's high water alarm

---

[8]Because the Court finds that the proximate cause of the loss was not the leak in the keel, the Court need not address Defendants' arguments that the loss was caused by "gradual deterioration" of the keel, or that the condition of the keel constituted a hidden or latent defect.

before he left the house that morning if they were, in fact, operable at the time of the sinking.

The parties' experts all agree that R.RENDEZVOUS would not have sunk as quickly or in the manner that it did if the sea chests had been secured watertight. [Gimpel Depo. p. 85; Connell Depo. p. 30; Trial Tr., p. 19 - 20; p. 26 - 27; 12/3/08]. Additionally, both Captain Smith and Commander Emond testified that if functional, the bilge pumps would have been able to handle the rate of water flow aboard the vessel prior to the submersion of the sea chests below the vessel's static water line. [Trial Tr., p. 26; 12/3/08; Trial Tr. p. 85; 12/3/08].

5. After careful consideration of all the evidence the Court finds that the failure to properly maintain the R.RENDEZVOUS by securing the watertight tops on the sea chests and maintaining operational bilge pumps and alarms aboard R. RENDEZVOUS was the proximate, efficient cause of the vessel's submersion on October 19, 2005.

### THE DEFENDANTS DID NOT EXERCISE DUE DILIGENCE TO MAINTAIN R.RENDEZVOUS

6. The New Hampshire Policy has a specific exclusion for loss attributable to "lack of reasonable care or due diligence, in the operation or maintenance of your yacht". Thus, any loss caused by a lack of due diligence of the insured or his agent in maintaining the vessel will not be covered. See Policy, Plaintiff's Ex No. 3, Section A, paragraphs 1 and 10; Int'l. Ship Repair & Marine Services, 944 F. Supp. at 892-893 (finding that such loss is fortuitous under an all risks policy, and hence covered, unless specifically excluded).

7. "Diligence" is defined as "Care; caution; the attention and care required from a person in a given situation." Black's Law Dictionary p. 468 (7th ed.). "Due

diligence" is defined as "[t]he diligence reasonably expected from, and ordinarily exercised by, a person who seeks to satisfy a legal obligation." Id.; see also Fireman's Fund Ins. Co. v. M/V Vignes, 794 F.2d 1552, 1556 (11th Cir. Fla. 1986) (stating that in the context of the Carriage of Goods by Sea Act, due diligence "comprehends inspection and investigation, where prudent, to determine the existence of deficiencies before they become critical, and the failure to discover defects which examination would necessarily have disclosed is the very absence of due diligence.") (quoting Ionian S.S. Co. v. United Distillers of America, Inc., 236 F.2d 78, (5th Cir.1956)).

8.   The Court finds that the evidence produced at trial overwhelmingly establishes that the Defendants did not exercise the requisite due diligence in the maintenance of R.RENDEZVOUS, with respect to Lockwood's failure to adequately examine the engine room bilges by lifting the aluminum deck plates and visually examine the area, to conduct testing of the engine room bilge pumps after 2002, and to undertake steps to ensure that the high water alarm system was operating properly prior to the vessel's submersion. The Court rejects Lockwood's testimony that he inspected the engine room bilges several hours prior to the sinking, in that the testimony as to the amount of water which would have gathered in the bilges at that time makes it evident that had he checked them as he testified, he would have seen it.

9.   The incident in April of 2004, when the engine room bilges became flooded with water overflowing from the black water tank, should have alerted those responsible for the vessel that there were several significant potential problems; namely the integrity of the black water tank, its cover, and/or the engine room bilge pump float switches.

However, the Defendants merely removed the excess water and took no steps to investigate the cause of the overflow. [Trial Tr. p. 120 - 122; 12/1/08].

10. The subsequent incident in July of 2005 when Lockwood had to manually activate the bilge pumps after the alarm sounded, also indicated that the float switches which were designed to activate the bilge pumps were apparently not operational, yet Lockwood took no additional steps to ensure that this equipment was functioning.

11. The Court finds that the evidence produced at trial overwhelmingly establishes that the Defendants also did not exercise the requisite due diligence in the maintenance of R.RENDEZVOUS with respect to Lockwood's failure to inspect the black water tank.

12. The Court finds that the failure to thoroughly inspect the engine room bilges, pump float switches and black water tank at least every six months exemplifies a lack of due diligence in the maintenance of R.RENDEZVOUS.

13. The circumstances in Reliance Ins. Co. v. McGrath, 671 F. Supp. 669 (N.D. Cal. 1987) bear a number of marked similarities to the case at Bar. The insured, McGrath, heard a banging on the wooden hull of his boat while backing out of his marina, after which he lost reverse steering on one engine. Id. at 671. Upon returning to the marina, McGrath's son put on a diving mask and inspected the hull with his hands, but his reach was limited. Id. The vessel remained at the marina, and over the next six months the bilge pumps had to be manually activated twice weekly because of unusual and repeated water ingress. Id. The marina owner telephoned McGrath on four separate occasions to tell him his boat was taking on water. Id. at 672. The boat eventually sank at the dock and upon inspection was found to have a hole in her port