bow and her bottom covered with marine growth, the anti-fouling paint worn off and worms in the hull. Id. The boat had not been hauled in three years. Id. at 670.

14.     McGrath was insured against all risks of direct physical loss of or damage to the property, including latent defects, provided that loss or damage had not resulted from want of due diligence. In a detailed opinion, the Court found that McGrath's failure to thoroughly inspect the vessel after striking a submerged object, especially with the yacht taking on inordinate amounts of water subsequently for a year, constituted negligence and a lack of due diligence. Id. at 674-75; see also Commercial Union Ins. Co. of New York v. Daniels, 343 F. Supp. 674 (S.D. Tex. 1972) (finding that leaving sea valve open was result of lack of due diligence of vessel's owner).

15.     The Owners of R.RENDEZVOUS took no steps to inspect the black water tank, its cover and the bilge alarm system, or take any investigative measures despite the extraordinary overspill of the tank on the unmanned, little-used vessel in April of 2004. The Court finds that this lack of "inspection and investigation, where prudent, to determine the existence of deficiencies before they become critical" constitutes the exact lack of due diligence in the maintenance of R.RENDEZVOUS contemplated in the Policy.

16.     The Court further finds that leaving the sea chest covers unattended and unsecured, even while the vessel is moored, does not comport with sound marine practice. The undisputed testimony of all witnesses was that the unsecured condition of the sea chest covers (including missing bolts, bolts and nuts lying on top of the lids) was open, obvious and readily detectable by casual inspection. The experts for both sides agreed not only that such a condition was unseaworthy, but would have been the result

26

of a lack of due diligence on the part of Arnie Lockwood in the maintenance of the vessel, a cause expressly excluded under the policy. To the extent that Mr. Conner testified that it was common in the industry to leave the covers open for cleaning and cooling purposes, such a practice on the R.RENDEZVOUS would demonstrate a lack of due diligence in maintenance, given the vessel's history of repeated keel repairs and water intrusion.

17. In sum, the conditions which led to the partial submersion of R.RENDEZVOUS on October 19, 2005, were all detectable through the exercise of due diligence and the implementation of a regularly scheduled inspection and maintenance program. In the case of the black water tank cover and the sea chest covers, the conditions were open and obvious, had anyone bothered to look.[9] Moreover, to the extent that there is inconclusive evidence as to the exact amount of time any one of the improper maintenance conditions on the R.RENDEZVOUS existed prior to the sinking, when one considers how many of those conditions there were, and the minimal maintenance schedule testified to by Lockwood, there is sufficient cause to believe that at least one of these conditions existed for a sufficient time that Lockwood should have recognized and corrected it in the exercise of due diligence.

---

[9] As for the allegation that any failure of machinery aboard the yacht was the fault of others for whom the Defendants were not responsible, the Defendants have not produced any evidence that identifies anyone, outside of some vague references in Lockwood's trial testimony to work done in the vessel's engine room [Trial Tr. 123 - 124; 12/1/08] and Krilich's "understanding" that an air conditioning repairman "may have" removed the sea chest cover, and presumably did not replace it securely. [Krilich Depo. p. 83, 85, 87].

## ARNIE LOCKWOOD'S NEGLECT AND FAILURE TO EXERCISE DUE DILIGENCE IN THE MAINTENANCE OF R.RENDEZVOUS IS CHARGEABLE TO THE DEFENDANTS

18.   It is axiomatic that a corporation, a fictional being, a creation of the law, can act only through its agents. Jacksonville American Pub. Co. v. Jacksonville Paper Co., 143 Fla. 835, 846 (Fla. 1940). It has been said that the *only way* to communicate actual notice to a corporation is through its agents. American Standard Credit, Inc. v. National Cement Co., 643 F.2d 248, 270 (5th Cir.1981).

19.   Moreover, a corporation is charged with constructive knowledge, regardless of its actual knowledge, of all material facts of which its officer or agent receives notice or acquires knowledge while acting within the course of employment and within the scope of his or her authority, even though the officer or agent does not in fact communicate the knowledge to the corporation. Id. at 271.

20.   "The law conclusively presumes that the agent has disclosed the knowledge or information to his or her principal, and charges the principal accordingly." Gutter v. E.I. DuPont de Nemours, 124 F. Supp. 2d 1291, 1309 (S.D. Fla. 2000) (citing 3 William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 790 (1994)).

21.   In this instance the evidence is unequivocal that Rainbow Air Corporation, as well as its sole shareholder, Robert Krilich, delegated to Arnie Lockwood the authority to act as primary caretaker and maintain the vessel on behalf of the corporation and its sole shareholder. Thus it is clear that Lockwood acted as agent for both the corporation as well as personally for its sole shareholder, Robert Krilich.

22. All of Lockwood's material personal deficiencies in the inspection and upkeep of the yacht are chargeable to the Defendants as a matter of law. Thus, Lockwood's failure to: personally inspect the engine room bilge pumps after 2002; personally undertake steps to ensure that the high water alarm system was operating properly; *ever* personally lift up the deck plates and examine the black water tank and its cover; personally investigate the circumstances surrounding the sewage overflow in April 2004; personally insure that the covers to the sea chests were secured, watertight, among other lapses, all redound to the corporate Defendant.

23. Although Lockwood's mere designation by the corporation as its primary agent is sufficient at law to charge the corporate Defendant, Rainbow Air, with the knowledge of the material facts and circumstances of neglect aboard R.RENDEZVOUS, the evidence establishes that Lockwood kept both the corporation as well as Robert Krilich thoroughly informed of what he was – and was not – doing onboard the vessel. [Trial Tr. p. 125, 12/1/08; Trial Tr. p. 201; 12/2/08; Trial Tr. p. 141 - 142, 12/4/08; Plaintiff's Ex. Nos. 27; 29; 34].

24. Thus, the Court finds as a matter of law that the Defendants were well aware of, and thus responsible for, the numerous deficiencies aboard R.RENDEZVOUS at the time of her submersion.

### NEGATIVE IMPLIED WARRANTY OF SEAWORTHINESS / THE PRESUMPTION OF UNSEAWORTHINESS WHEN A VESSEL SINKS IN CALM WATER

25. Although the Court need not reach the issue of whether the R.RENDEZVOUS was unseaworthy at the time the risk attached, there is another warranty of seaworthiness which the Court does find was breached. The Federal

maritime law imposes a "negative modified warranty" of seaworthiness in a time policy of insurance such as the instant Policy, which mandates that the insured, "from bad faith or neglect, will not knowingly permit the vessel to break ground in an unseaworthy condition." Gulfstream Cargo, Ltd. v. Reliance Ins. Co., 409 F.2d 974, 983 (5th Cir. 1969).

26. A breach of the negative modified warranty of seaworthiness results in the denial of liability for a loss proximately caused by the unseaworthiness. Lloyd's U.S. Corp. v. Smallwood, 719 F. Supp. 1540, 1545 (M.D. Fla. 1989).

27. "The warranty of seaworthiness has been held to mean 'that the vessel is reasonably fit for the intended use." Smallwood, 719 F. Supp. at 1545 (quoting Aguirre v. Citizens Casualty Co., 441 F.2d 141, 144 (5th Cir.), cert. denied, 404 U.S. 829 (1971)). [At the inception of the policy the Defendants, through their insurance broker, stated that the vessel does not operate more than 50 hours a year; in other words, the yacht was expected to stay moored at her berth for approximately 363 days a year.] The warranty includes the insured's obligation to maintain the vessel safe in port, at her berth, as well as at sea. See generally, Reisman v. New Hampshire Fire Ins. Co., 312 F.2d 17 (5th Cir. 1963); Commercial Union Ins. Co. v. Daniels, 343 F. Supp. 674 (S.D. Tex. 1972). Obviously, the intended use of the R. RENDEZVOUS, as far as New Hampshire was aware, was to remain at her berth, safely afloat.

28. When a vessel sinks at her berth under benign conditions and calm waters, a presumption arises that the vessel was unseaworthy. Kilpatrick Marine Piling v. Fireman's Fund Ins. Co., 795 F.2d 940, 944 (11th Cir. Ga. 1986); Underwriters at

Lloyd's v. Labarca, 260 F.3d 3, 8 (1st Cir. 2001); Reisman, 312 F.2d at 20.[10] This Court therefore finds that even if the evidence were insufficient to prove that the proximate cause of the sinking was the unsecured sea chests and inoperable bilge switches, there is a presumption that the vessel was unseaworthy.

29.   The effect of the presumption is to shift the burden of proof to the insured to demonstrate that the vessel was, in fact, seaworthy before the loss. Kilpatrick, 795 F.2d at 944; Reisman, 312 F.2d at 20.

30.   The evidence required to rebut the presumption must be sufficient to *prove* the vessel's seaworthiness - it must be "competent" to establish that the vessel was, in fact, seaworthy. Labarca, 260 F.3d at 8.

31.   The Court finds that the Defendants have failed to rebut the presumption that R.RENDEZVOUS was, in fact, unseaworthy at the time of the loss. In fact, Defendants presented little evidence, either by way of expert opinion or documentation, as to the vessel's overall seaworthiness at the time of submersion. During his deposition surveyor Robert Connell testified that it was acceptable to leave the black water tank uncovered if there was no water intrusion, but he agreed that the water aboard R. RENDEZVOUS would not have progressed to the bilges had the cover been secured. Mr. Connell also questioned whether anyone working on the vessel's foredeck would have heard the bilge alarms. The Court rejects this testimony as it conflicts with that of every other witness associated with the case, including the current and former

---

[10] There was evidence that although the boat was in a no-wake zone, other speeding boaters did create wakes which in turn affected the vessel. Although Defendants maintain that this presumption "generally arises in the context of a 'peril of the seas' policy, which is not at issue here" (Def. Proposed Findings of Fact and Conclusions of Law at p. 29), Defendants have not cited any case law which suggests that it would not also apply in the context of the marine policy involved here.

captains of the vessel, and it defies logic to believe that they could not be heard on the foredeck of the vessel itself. Finally, Mr. Conner testified that it was not necessary to have the sea chests covered, as long as they remained above the vessel's static water line. However, even Mr. Conner agreed the better practice is to secure them. [Connell Depo. p. 27; p. 83; p. 44]. The Court notes that this would particularly be true as to a vessel such as R.RENDEZVOUS, which had a history of water intrusion and was often affected by wakes.[11]

32.   Even if one were to accept the somewhat dubious proposition offered by Defendants that it is not necessarily unseaworthy for a vessel to have a fracture in her keel; that it is not unseaworthiness *per se* to leave the watertight top to the black water tank open, especially when moored; that it is not necessarily unseaworthy to have the bilge pumps and alarms turned off when the vessel is at berth in inland waters; or that it is not unreasonable to leave the tops to the sea chests unsecured while moored, Defendants have not demonstrated that a vessel can remain seaworthy under the onslaught of the cumulative totality of these conditions.

The Court finds that the Defendants have failed to carry their burden of proof to overcome the presumption of unseaworthiness that arose when the vessel sank in calm waters.

---

[11]To the limited extent that Mr. Connell's testimony supports the Defendants' case, the Court does not give that testimony significant weight for several reasons. First, Mr. Connell did not examine the vessel until two months after the sinking. His experience is mainly in interior vessel design and management of boat yards, rather than vessel maintenance. [Trial Tr., p. 91-94; 12/4/08]. Furthermore, despite the numerous documented maintenance issues which existed on the vessel from 1998 through 2005, Mr. Connell testified that he found those maintenance practices to be "reasonable" and "adequate." [Trial Tr., p. 102; 12/4/08].

33. Defendants argue that even if they have failed to carry their burden meet their burden of proving seaworthiness, Plaintiff has failed to prove that Defendants "knowingly" permitted the vessel to break ground in an unseaworthy condition. With respect to the sea chests, although there may not have been direct evidence that Lockwood knew that the covers were not secured on the date in question (though a reasonable inspection would have disclosed this), Lockwood did know that the bilge pumps had not operated automatically on two prior occasions in which the boat had taken on water, and no subsequent maintenance was done with respect to that issue. In spite of this fact, Lockwood had no regular schedule to inspect the alarms, the pumps, the black water tank or the sea chests. Accordingly, the Court finds that Lockwood, and therefore Defendants, did knowingly permit the R.RENDEZVOUS to remain docked at her berth in an unseaworthy condition.

34. The Court therefore finds that Defendants are in breach of the warranty of seaworthiness implied in the Policy by the general maritime law and not entitled to coverage. As set forth in further detail *supra,* each of these conditions was also detectible and preventable in the exercise of due diligence and each condition was, itself, an excluded cause of loss.

### R.RENDEZVOUS SANK DUE TO THE UNSEAWORTHY CONDITIONS EXISTING ONBOARD FOR WHICH DEFENDANTS WERE RESPONSIBLE

35. The evidence produced at trial establishes a clear, unerring link between the various deficient conditions existing onboard R.RENDEZVOUS and the submersion. There was near unanimity among all the witnesses at trial regarding the events of the progressive flooding onboard and the path of the seawater as it coursed through the

yacht and eventually sank the vessel. The record contains no plausible evidence to sustain Defendants' affirmative defense that the conditions onboard R.RENDEZVOUS played no part in the submersion or that the vessel sank as the result of "an unexpected and not reasonably apparent rupture in the keel" - the precise opposite is the case.

36. Similarly, the Court rejects Defendants' assertion that any failure of machinery aboard the yacht was the fault of others for whom the Defendants were not responsible. Neither Krilich's nor Lockwood's speculation regarding an unknown air conditioning repairman's alleged failure to replace the sea chest covers securely absolves the Defendants of the responsibility for inspecting their condition afterward; further, even if the conjecture was accurate, the fact remains that the condition of the sea chests was open and obvious on the date of submersion, as conceded by Lockwood, yet nothing was done.

37. The Defendants have the burden of proof in establishing the elements of their affirmative defenses. See, e.g., Tello v. Dean Witter Reynolds, Inc., 410 F.3d 1275, 1292 (11th Cir. Fla. 2005) The Court finds that the preponderance of the evidence weighs against the Defendants' position.

Accordingly, the Court finds, after consideration of all the evidence, that there is no coverage under New Hampshire's all risks policy of hull and machinery for the submersion of R.RENDEZVOUS at her berth on October 19, 2005. Based on the foregoing findings of fact and conclusions of law the Defendants' counterclaim for breach of contract is **DISMISSED** with prejudice and **FINAL JUDGMENT** is given for

and in favor of Plaintiff.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 3RD day of June, 2009.

STEPHEN T. BROWN
CHIEF UNITED STATES MAGISTRATE JUDGE

cc:   counsel of record